– For Publication –

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **PHILADELPHIA WORKFORCE**<br>**DEVELOPMENT CORPORATION,**<br>        **Plaintiff,**<br><br>        **v.**<br><br>**KRA CORPORATION,**<br>                **Defendant.** | **CIVIL ACTION**<br><br><br><br>**NO.  09-5261** |

**OPINION**

## I.       INTRODUCTION

        The parties in this case have been in engaged in a long running battle which took six years from the date the Plaintiff filed its Complaint to the date the parties tried their disputes to a jury.  Philadelphia Work Force Development Corporation ("PWDC") is an entity which administers federal and state funds to develop workplace skills for qualified Philadelphians who are unemployed and underemployed.  KRA Corporation ("KRA") is a for-profit entity that it hired to provide some of those services.  The dispute concerns who owes what under the various contracts between the two entities.  On October 13, 2015, after an eight day trial, a jury awarded PWDC $161,151.  KRA has filed a motion asking the Court to set aside the jury's verdict and grant KRA judgment as a matter of law under Federal Rule of Civil Procedure 50(b), or, in the alternative, to grant a new trial under Federal Rule of Civil Procedure 59.  Because the Court finds no grounds to disturb the jury's verdict, KRA's motion is denied.

## II.      FACTS

        PWDC is an organization that acts as a fiscal agent for the City of Philadelphia with a

mission of connecting employers to a skilled workforce and helping individuals develop the skills needed to thrive in the workplace.  Joint Appendix ("J.A.") at 1418 (ECF Nos. 179, 181 and 182).[1]  As part of its mission, PWDC administers workforce development and job-specific skills training programs designed to raise the employability of unemployed or underemployed individuals.  J.A.1418.

Under the federal government's Temporary Assistance for Needy Families ("TANF") program, individuals receiving TANF benefits must participate in workforce development programs.  *Id*.  The United States Department of Health and Human Services ("HHS") provides funding for workforce development programs for TANF recipients.  *Id*.  HHS provides that funding to various state recipients through specific grants.  The Commonwealth of Pennsylvania is one of those recipients.  *Id*.  The Commonwealth of Pennsylvania also contributes funding to workforce development programs for TANF recipients.  At all times material hereto, the Department of Public Welfare, Office of Income Maintenance, Bureau of Employment and Training Programs ("BETP") administered and distributed funding received from HHS and additional state funds to local governments to operate these programs.  *Id*.

Although the majority of TANF sub-recipients in Pennsylvania are municipal entities, for the City of Philadelphia, the TANF sub-recipient is PWDC.  *Id*.  BETP provided TANF funding to PWDC as the fiscal agent of the City of Philadelphia.  *Id*.  When the TANF program was first developed, PWDC actively managed the workforce development program—it employed staff to evaluate TANF recipients to determine what specific services would be appropriate for each recipient.  *Id*.  In approximately 2005, the workforce development program was modified with the introduction of Employment Advancement and Retention Network Centers ("EARN

---

[1] In 2012, PWDC merged with Philadelphia Workforce Investment Board Inc.; the new entity is Philadelphia Works, Inc.  Jt. Fact. Stip. ¶ 2.

Centers").[2]  J.A. 1420.  PWDC contracted with both non-profit and for-profit entities to provide specific workforce development programs at the EARN centers.  J.A. 1419.  One of the for-profit entities was KRA.  J.A. 1419.  The contracts at issue in the case are agreements between PWDC and KRA: (1) to operate an EARN Center in Germantown (the "Germantown Center") for Fiscal Years 2008 and 2009; (2) to operate an EARN Center in West Philadelphia (the "Delancey Center") for Fiscal Years 2008 and 2009; (3) to operate two Job Specific Skills Training ("JSST") programs for dental assistants and phlebotomists at the Delancey EARN Center for Fiscal Year 2009 (together "the Contracts").  J.A. 1420-21.

The parties agree that the contracts are "hybrid" contracts.  J.A. 1421.  This hybrid structure provides for both cost-reimbursement and performance-based payments.  J.A. 43.  The cost-reimbursement component allows for reimbursement of operations costs and direct client expenses that are allowable under the terms of the Contracts and approved in the budgets attached to the Contracts.  J.A. 27, 34.  The performance-based component allows for payments based on the contractor's attainment of specific performance benchmarks set forth in Rider A of the Contracts.  J.A. 36.

The contractual relationship between PWDC and KRA initially appeared to be going well.  KRA did the work, invoiced PWDC, and PWDC paid approved invoices.  J.A. 1421; KRA's Statement of Facts (ECF No. 178-1) and PWDC's Response to KRA's Statement of Facts (ECF No. 180-4) (together "Statement of Facts") ¶ 12.  However, things began to fall apart when, on May 13, 2009, the Commonwealth of Pennsylvania, Bureau of Financial Operations

---

[2] The purpose of an EARN Center is to provide a centralized place where clients can receive comprehensive services that promote the ultimate goal of self-sufficiency by encouraging them to improve their income capacity as well as obtain and retain appropriate employment.  J.A. 1420.  The services provided are tailored to each recipient's needs, spanning from remedial education, training in specific skills, instructions in preparing a resume or participating in a job interview or oversight during a job search.  *Id*.

("BFO") issued a report of an audit it conducted of PWDC (the "BFO Report"), *see* J.A. 644-70; Statement of Facts ¶ 15, in which it recommended that $2,219,060.00 be recovered from PWDC. J.A. 329, 1420.  A month later, on June 18, 2009, PWDC notified KRA that it was suspending payments to KRA, a position it reiterated three weeks later, on July 9, 2009.  J.A. 1421.

Around the same time, the Commonwealth experienced a budget impasse (the "Budget Impasse"), one practical result of which was that the parties were unable to enter into FY 2010 contracts.  *Id*.  Nevertheless, KRA agreed to operate the Delancey and Germantown EARN Centers for three months without a signed contract (the "FY 2010 time period") and, having performed work under that arrangement, invoiced PWDC.  *Id*.  Although PWDC approved most but not all of the invoiced amounts, KRA alleged it was never reimbursed for work it performed during the FY 2010 time period.  J.A. 1422, 2664; Statement of Facts ¶ 26.

In September 2009, PWDC concluded, as a result of its year-end audit of the FY 2009 Contracts, that $1,368,132.50 of KRA's FY 2009 invoiced payments should be disallowed. Statement of Facts ¶ 22.  These disallowances were set forth in a set of spreadsheets produced by PWDC (the "PWDC Schedules").  Statement of Facts ¶ 21.

In the fall of 2009, PWDC sued KRA seeking damages for breach of contract, replevin and conversion claiming that KRA was paid in excess of the amount allowable by the Contracts, and was thus required to return that overpayment to PWDC.  Am. Compl. ¶ 19.  After some procedural back and forth, KRA filed counterclaims through which it sought payment and cost reimbursement for amounts it claimed it was owed under its contracts with PWDC arising from PWDC's suspension of payments to KRA in 2009.[3]

---

[3] Shortly after KRA filed its counterclaims the matter was stayed on motion of the United States Attorney for the Eastern District of Pennsylvania.  ECF No. 50.  The stay was not lifted until spring 2012, at which point the parties resumed fact discovery.  On February 28, 2014, KRA filed a motion for summary judgment.  On April 3, 2014, PWDC filed a cross motion for summary judgment.  On May 15, 2014, KRA filed objections to PWDC's inclusion

Trial of this matter commenced on October 1, 2015.  At the close of PWDC's case and again at the close of KRA's case, the Court denied KRA's motion and renewed motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50.  On November 10, 2015, KRA filed the instant Renewed Motion for Judgment as a Matter of Law and/or a New Trial (the "Post-Trial Motion").

## III.    CLAIMS AT TRIAL

To situate the analysis of KRA's Post-Trial Motion, it is useful first to summarize the positions presented through evidence and argument at trial.

FY 2008 Contracts:  PWDC's breach of contract claim arises from the FY 2008 EARN Center Contracts.  PWDC alleged that KRA was overpaid under the FY 2008 Contracts by $2,219,060.00, and that this overpayment (the "FY 2008 Overpayment") was discovered when the BFO Audit disallowed certain payments made to KRA under the FY 2008 Contracts. Specifically, the BFO found that:

(1) $1,819,184 of the performance-based payments to KRA was not supported by actual expenses (the "Performance-Based Overpayment").  This disallowance is based on the interpretation of the Contracts that such payments constitute "Program Income," which must be returned to PWDC.  J.A. 330, 334-45.

(2) $334,404 in support services payments was unsubstantiated or unauthorized by the Contracts (the "Support Services Overpayment").  J.A. 330, 335.  PWDC bases this disallowance on the provisions in the Contracts that provide for audits and that require contractors to return payments found in an audit to be unauthorized.  PWDC Br. (ECF No. 180) at 9-10.

(3) $50,773 in operating expenditures was unsubstantiated or ineligible for reimbursement under the Contracts (the "Direct Operating Overpayment").  J.A. 330,

---

of the BFO Report and the PWDC Schedules as exhibits to PWDC's cross-motion for summary judgment.   On October 7, 2014, the Court overruled KRA's objections, denied both parties' respective motions for summary judgment without opinion, and set the matter for trial to begin on February 9, 2015.  The trial date was later postponed and, on February 4, 2015, the matter was transferred from the docket of Judge Schiller to the docket of this Court.

336.  PWDC also bases this disallowance on the audit and return provisions in the Contracts.  PWDC Br. at 9-10.

(4) $29,427 in indirect administrative costs was ineligible for payment and there was an error in the cost allocation percentage that had been applied (the "Indirect Costs Overpayment").  J.A. 330, 336.  PWDC based this disallowance on audit provisions of the Contracts as well as its interpretation of contractual provisions that KRA's FY 2008 indirect administrative cost allocation rate is limited to 10.6%.  PWDC Br. at 9-10.

KRA denied that it owes any of the FY 2008 Overpayment to PWDC.  Specifically, KRA argued at trial, and continues to argue in support of its Post-Trial Motion, that:

(1) The Performance-Based Overpayment was improperly disallowed because the Contracts allow for-profit entities to retain performance-based payments in excess of actual expenses and the FY 2008 performance-based payments were approved by PWDC through the invoicing process set forth in the Contracts.  KRA Br. (ECF No. 178) at 7-18.

(2) The Support Services Overpayment was improperly disallowed because PWDC could not show through admissible evidence that the disallowed expenses were, in fact, unauthorized by the Contracts.  *Id.* at 19-24.

(3) The Direct Operating Overpayment was improperly disallowed because PWDC could not show through admissible evidence that the disallowed expenses were, in fact, unauthorized by the Contracts.  *Id.* at 19-24.

(4) The Indirect Costs Overpayment was improperly disallowed because PWDC could not show that such costs were, in fact, unauthorized by the Contracts.[4] *Id.* at 19-24.

KRA's overall challenge to PWDC's disallowances is underscored by the argument that the limits to profit set forth in the Contracts apply only to the cost-reimbursement payment provisions, and thus that there is no limit to KRA's overall profit under a hybrid contract.  *Id.* at 19-24.

FY 2009 Contracts:  As noted earlier, PWDC ceased payment to KRA during FY 2009 and conducted an audit of KRA's FY 2009 invoices.  Based on this audit, PWDC concluded that

---

[4] KRA argued in its Post-Trial Motion that PWDC's 2009 Indirect Cost Disallowances were contrary to the language of the Contracts, but this argument explicitly applied only to FY 2009 and no such argument was asserted concerning FY 2008.

many of KRA's FY 2009 costs were not allowable under the Contracts—a conclusion with

which KRA disagrees.  Specifically at trial PWDC and KRA presented evidence and arguments

as follows:

> (1) PWDC disallowed all $1,118,521.62 in KRA's claimed indirect administrative
> expenses for FY 2009 (the "Indirect Cost Disallowance") due to "insufficient
> documentation to support expense," and because the FY 2009 budget summaries
> attached to the FY 2009 Contracts do not provide for any indirect administrative
> costs.  J.A. 360, 372, 376, 380; Trial Tr. 141:8-9, 144:14-22, 154:9-10, 161:17-19,
> Oct. 2, 2015  (ECF No. 169).  KRA argued at trial to the contrary that the Indirect
> Cost Disallowance was improper because KRA was not required to justify its indirect
> expense allocation rate, since the rate was specified in the Contracts.  *See* KRA Br. at
> 24-25.

> (2) PWDC disallowed $800,747.69 in program expenses due to lack of support
> documentation and $66.48 as "unallowable program expense" (collectively, the
> "Program Expense Disallowance").  J.A. 361, 373, 377, 381.  KRA contended to the
> contrary that the Program Expense Disallowance was not supported by admissible
> evidence and, even if the evidence was admissible, it was insufficient to support
> PWDC's disallowances.   KRA Br. at 19-24.

> (3) PWDC disallowed $13,721.77 to adjust profits to comply with the 10%-of-total-costs
> limit on profit imposed by the Contracts (the "Profit Disallowance").  J.A. 361, 373,
> 377, 381.  KRA counters that since the Profit Disallowance was contingent on the
> other Program Expense Disallowances, it was also not supported by admissible
> evidence and, even if the evidence was admissible, it was insufficient to support
> PWDC's Program Expense Disallowances.  Additionally, KRA argues that the
> contractual provisions limiting profits to 10% of costs apply only to cost-
> reimbursement payments, and not to the total profit under a hybrid contract.  KRA Br.
> at 7-24.

Over eight days, the parties presented to the jury, through documents, testimony and

arguments, their starkly different perspectives on how the Contracts should be interpreted with

respect to what KRA should, or should not be paid.  Subtracting its disallowances from KRA's

invoices, and accounting for the payments already made to KRA during FY 2009, PWDC

submitted that KRA was owed a net of $59,190 under the FY 2009 Contracts.  PWDC also

stipulated that KRA submitted invoices for $1,998,719 in allowable costs for FY 2010, which

were not paid.  Deducting these previously unpaid allowable costs from FY 2009 and FY 2010

from the FY 2008 Overpayment of $2,219,060, PWDC sought $161,151.00 in contract damages at trial.  KRA, countered that: (1) PWDC did not have a right to recover the FY 2008 Overpayment; (2) that all its unpaid invoices submitted in FY 2009 and FY 2010 should be paid; and (3) that it had complied with all the contractual invoicing provisions which compliance entitled it to full payment of all submitted invoices.  KRA Br. at 8-11.

After deliberation, in response to verdict sheet interrogatories that had been agreed to by the parties, the jury: (1) found that KRA breached the FY 2008 contracts; (2) awarded PWDC $2,219,060 for the FY 2008 contracts; (3) found that KRA breached and that PWDC did not breach the FY 2009 contracts; (4) found that the net amount due to KRA for FY 2009 was $59,190; (5) found that the amount PWDC owed KRA for cost reimbursement for FY 2010 was $1,998,719; and (6) setting off the amounts owed to KRA for FY 2009 and FY 2008 from the amount owed to PWDC for FY 2008, KRA owed PWDC $161,151.   In finding for PWDC in that amount, the jury necessarily adopted PWDC's interpretation of the material provisions of the Contracts.

## IV.   RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

The grant of a motion for judgment as a matter of law after trial is warranted "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993).  In considering the evidence, "the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version." *Id.*  "Although judgment as a matter of law should be granted sparingly, a scintilla of evidence is not enough to sustain a verdict of liability." *Id.*  At bottom, "'[t]he question is not whether there is literally no evidence

supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party.'" *Id.* (quoting *Patzig v. O'Neil*, 577 F.2d 841, 846 (3d Cir. 1978)).  In other words, judgment as a matter of law should be granted if the record is "critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief."  *Dawson v. Chrysler Corp.,* 630 F.2d 950, 959 (3d Cir. 1980) (citations omitted).

KRA seeks entry of judgment as a matter of law as follows: (1) vacating the jury's verdict for a set off amount of $2,219,060 for FY 2008; (2) vacating the jury's verdict as to the FY 2009 contracts and finding that PWDC owes KRA $1,322,081.04 for the Delancey EARN Center contract, $1,362,980.30 for the Germantown EARN Center contract, $90,846.56 for the Dental JSST contract and $54,052.90 for the Phlebotomy JSST contract; (3) finding that PWDC owes KRA $1,998,719 for the FY 2010 EARN Center contracts and $72,353.45 for the FY 2010 Dental JSST contract.  KRA's Mot. at 1-2.

Though KRA makes numerous arguments in support of its Post-Trial Motion, those arguments ultimately fall into three buckets:  (1) the language of the Contracts unambiguously supports KRA's interpretation of the Contracts as a matter of law; (2) the admissible evidence at trial does not support the finding that KRA breached the Contracts, nor that PWDC did not breach on the Contracts; and (3) PWDC was allowed to recover at trial upon claims it had not previously disclosed.

A.      **Contract Interpretation**

KRA's argument concerning contract interpretation renews a central theme it presented at trial: to wit, that KRA is a for-profit entity which, as a fiscal matter, would not have entered into an agreement that limits, in the way that PWDC contends the Contracts do, the profits it could

make under the Contracts.  PWDC's response at trial was that, regardless of KRA's views of how much profit it should be able to make from the contracts it entered into, contractual provisions specifically limit profits.

In support of its Post-Trial Motion, KRA argues that the Contracts "clearly and unambiguously establish the nature and methodology for compensating KRA."  KRA Br. at 8.  More specifically, KRA contends that each component of the compensation it sought at trial— partial reimbursement of the costs of providing program services, reimbursement for all direct client expenses, and full payment for all performance benchmarks achieved—is unambiguously established by the terms of the Contracts and thus, contrary to the jury's verdict, KRA is entitled to retain full payment for amounts invoiced to PWDC.  *Id.*

This is not the first time that KRA has raised its contention that the terms of the Contracts unambiguously support its view of what and how it should be paid.  These arguments were made first in its motion for summary judgment (which was denied without opinion by the Court's esteemed colleague Judge Berle M. Schiller who was then presiding over the case) and then in a motion in limine filed on the eve of trial asking the Court to "rule pretrial that KRA is entitled to the full amount of the performance-based payments it achieved and exclude parol evidence in support of inconsistent interpretations of the Agreements or evidence applying a different compensation methodology."  KRA Mot. in Limine at 2 (ECF No. 111).  In its motion in limine, KRA properly stated that whether a contract is ambiguous or not is a matter to be determined by the court.  *Id.* at 6; *see Sheet Metal Workers, Local 19 v. 2300 Grp., Inc.*, 949 F.2d 1274, 1284 (3d Cir. 1991) (holding that court must make the initial determination whether the terms of a contract are susceptible to different meanings).  In denying the motion in limine, the Court necessarily found that the material payment terms of the Contracts were ambiguous as a matter

of law.  Thus, the parties proceeded to present to the jury exhibits and testimony concerning the language of the contracts along with parol evidence of the intent of the parties.  KRA's renewal of its contract interpretation argument after trial remains unavailing because: (1) the material disputed terms of the Contracts are ambiguous as a matter of law; and, (2) there was sufficient evidence at trial for the jury to accept PWDC's reasonable interpretation of the Contracts.

### 1.   The Court's Determination of Contractual Ambiguity

To obtain a post-trial judgment as a matter of law on the basis of contract interpretation, KRA must show "'that the contract is so clear it can only be read one way.'"  *L.P.P.R. v. Keller Crescent Corp.*, 532 F. App'x 268, 273 (3d Cir. 2013) (quoting *Pennbarr Corp. v. Ins. Co. of N. Am.*, 976 F.2d 145, 149 (3d Cir. 1992)).  In other words, KRA must show that the Court's pre-trial finding of contractual ambiguity was incorrect.  Since no opinion was issued with the denial of KRA's motion in limine and the issue of contractual ambiguity is central to KRA's Post-Trial Motion, the Court will now explain why the Contracts are ambiguous as a matter of law.

Under Pennsylvania law, "'[a] contract will be found ambiguous 'if, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning.'"  *Duquesne Light Co. v. Westinghouse Elec. Co.*, 66 F.3d 604, 614 (3d Cir. 1995) (quoting *Samuel Rappaport Family P'ship v. Meridian Bank*, 657 A.2d 17, 21-22 (Pa. Super. Ct. 1995) (quoting *Krizovensky v. Krizovensky*, 624 A.2d 638, 642 (Pa. Super. Ct. 1993))).  In examining a contract for ambiguity, "the court may consider 'the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning.'"  *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*,

247 F.3d 79, 93 (3d Cir. 2001) (quoting *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1011 (3d Cir. 1980).

Though a court may consider extrinsic evidence that reveals a latent ambiguity, this analysis "must be careful not to cross the point at which interpretation becomes alteration of the written contract." *Id.* at 94 (internal quotation marks omitted). Synthesizing the pertinent decisions of Pennsylvania courts, the Third Circuit has found that:

> (1) mere disagreement between the parties over the meaning of a term is insufficient to establish that term as ambiguous; (2) each party's proffered interpretation must be reasonable, in that there must be evidence in the contract to support the interpretation beyond the party's mere claim of ambiguity; and (3) the proffered interpretation cannot contradict the common understanding of the disputed term or phrase when there is another term that the parties could easily have used to convey this contradictory meaning.

*Id.* at 94-95. Ultimately, if the court determines that both parties have proffered an interpretation that can be supported by the written contract, "a decision as to which of the competing interpretations of the contract is the correct one is reserved for the factfinder, who would examine the content of the extrinsic evidence (along with all the other evidence) in order to make this determination." *Id.* at 94.

### a. PWDC's Right to Conduct Audits and Recover Payments

In its motion in limine, KRA's argument concerning unambiguous Contract provisions focused on the Performance-Based Overpayment. In its Post-Trial Motion, KRA appears to have expanded its argument to contend that the Contracts unambiguously do not permit any of PWDC's disallowances other than those for direct client expenses. *See* KRA Br. at 11. To support this apparently broader argument, KRA cites several provisions which set forth the basic payment and invoicing procedures under the Contracts. KRA references budgeted cost-reimbursement provisions for operations expenses and direct client advances (J.A. 125-26, 173-81, 278, 318-27), contractual criteria for assessing direct client advances (J.A. 165-69, 307-12),

provisions allowing payment for the achievement of specific performance benchmarks (J.A. 36, 125-29, 235, 278-81), monthly, quarterly, and semi-annual invoicing procedures, as well as the mid- and end-year closeout procedures.  J.A. 41, 45, 94, 131-32, 218-19.

While the provisions cited by KRA set forth a basic payment scheme and invoicing procedure, the Contracts also explicitly allow PWDC and the BETP to conduct audits, J.A. 68, 260, 1499, 1676, 1818, and provide that "PWDC's failure to either promptly discover or demand prompt payment for questioned or disallowed costs will not relieve Contractor from its obligation to repay the disallowance or questioned cost at the time of identification or demand." J.A. 61, 223, 1492, 1641, 1783.  This concept is reinforced by the section of the Invoicing Procedure Provisions which provides that "Contractor will remain liable for deficient audit findings even in the event that PWDC accepted Contractor's supporting information at the time of invoicing."  J.A. 41, 219, 1472, 1637, 1779.  Thus, the Contracts do not unambiguously entitle KRA to retain all properly invoiced payments; rather, they entitle PWDC to recover such payments in the event of audit deficiencies.  Accordingly, KRA's ultimate entitlement to payments turns on whether PWDC's disallowances are supported by the Contracts.

### b.  Contractual Basis for PWDC's Disallowances

Turning now to the core of the parties' contractual interpretation dispute: whether the Contracts support PWDC's disallowance of various performance-based and cost-reimbursement payments claimed by KRA.  The genesis of the dispute can be found in the nature of a "hybrid" contract, which combines cost-reimbursement and performance-based payments components. J.A. 1421.  Although each party agrees that they entered into a set of "hybrid" contracts, they have a fundamental parting of ways over what, in practical terms, that meant for KRA's earning capacity under the performance-based portion of the Contracts as compared to the cost-reimbursement portion of the Contracts.

13

### i.  Cost-Reimbursement Disallowances

There appears to be no dispute that profit under the cost-reimbursement aspect of the

Contracts is limited to 10% of total costs and that only "allowable" costs are eligible for

reimbursement.  The Contracts define Allowable Costs as "[c]osts which are necessary,

reasonable, and allowable under applicable Federal, state, and local law, including the TANF

regulations, for the proper administration and performance of the services to be provided under

this agreement," J.A. 31, and PWDC emphasized at trial that compliance with federal and state

regulations is a concept that pervades the Contracts.  KRA does not appear to challenge, at this

stage, PWDC's interpretation that the Contracts incorporate TANF regulations as well as a

manual used by the BETP to guide it in the conduct of its work (the "Master Guidelines").  To

the extent that KRA does challenge in its Post-Trial Motion the contractual basis for PWDC's

cost-reimbursement disallowances, it has made only a generic argument that its invoices were

proper and have not explained how PWDC's disallowances violate the unambiguous terms of the

Contracts.[5]  Specifically, KRA has not proposed an alternative to PWDC's view that the

Contracts allow for disallowance of payments based on lack of compliance with the Master

Guidelines or other TANF regulations, or proffered a reasonable interpretation of the Contracts

that would prevent PWDC from disallowing costs due to insufficient documentation.  Thus,

---

[5] The exception to this generic argument is KRA's challenge to PWDC's disallowance of FY 2009 indirect costs. KRA argues that this disallowance is inconsistent with the unambiguous terms of the Contracts because the Contracts provide an indirect expense allocation rate, but this argument ignores the fact that PWDC did not base its FY 2009 Indirect Cost Disallowance on the rate of expense allocation.  Rather, the primary basis for this disallowance was that the FY 2009 Budgets contained $0 allocated to indirect administrative expenses.  J.A. 360, 372, 376, 380.  Additionally, PWDC Chief Financial Officer Daniel Porter ("Porter") testified that the FY 2009 Indirect Costs were disallowed because there was insufficient documentation to support the expenses and there were no indirect costs contained in KRA's general ledger.  Trial Tr. 141:8-9, 144:14-22, 154:9-10 & 161:17-19, Oct. 2, 2015 (ECF No. 169).  Thus, KRA's contract interpretation argument on this point is irrelevant to the actual basis PWDC asserted for this disallowance.  Furthermore, the provision KRA cites in support of this argument provides that "[a] copy of the current negotiated rate, supporting both the base and the rate must accompany the proposal." J.A. 322.  Thus, even if this provision were the basis for PWDC's disallowance, the Contracts provide reasonable support for the interpretation that the negotiated rate was valid only to the extent that it was consistent with the appropriate federally approved indirect cost rate.

KRA has not shown that PWDC's proffered reasons for its cost-reimbursement disallowances were contrary to the language of the Contracts.

### ii.  Performance-Based Disallowances

While there is basic agreement concerning the limit to profit and allowable expense requirement for cost-reimbursement payments, there is a fundamental disagreement between the parties as to whether KRA is entitled to retain the full amount of performance-based payments or whether it must return performance-based payments that exceed actual expenses.  PWDC argues that performance-based payments in excess of actual expenses constitute "Program Income," which must, by the terms of the Contracts, be returned to PWDC, and that the only profit available to KRA under the Contracts is through a "Profit" budget line-item that cannot exceed 10% of total costs.  KRA, on the other hand, argues that performance-based payments in excess of actual expenses do not constitute Program Income in the context of for-profit contractors like itself.  Under this interpretation, KRA would be allowed to retain full performance-based payments regardless of actual expenses incurred (and thus, retain overall profit in excess of 10% of total costs).  Resolution of these competing positions turns on the interpretation and interplay of the "Profit," "Program Income," "Performance Based Contracts," and "Method of Payment" provisions of the Contracts.

Program Income:  The Contracts clearly require that Program Income be returned to PWDC.  J.A. 55, 1486.  However, the parties have presented starkly different views of what should be included as "Program Income."   PWDC emphasizes the portion of the definition of "Program Income" that provides, "In performance-based contracts, program income includes the difference between the payments received for completing the performance benchmarks and the actual expenses incurred in operating the program during the program year."  J.A. 37, 1468. KRA counters this provision with an earlier clause that defines Program Income as, *inter alia*,

"revenue in excess of costs earned by organizations other than those that are commercial."[6]
From this clause, KRA argues that there is a carve-out for for-profit contractors such that the
limitations on performance-based Program Income do not apply to it.

Neither the full text nor the structure of the definition resolves whether the clause cited
by KRA exempts for-profit contractors from the definition of performance-based Program
Income relied upon by PWDC.[7]  KRA argues that "revenue in excess of costs earned" refers, in
part, to performance-based payments in excess of actual expenses.  PWDC, on the other hand,
argues that "costs earned" refers only to costs under the cost-reimbursement aspect of the
Contracts, and thus the commercial-entity exception to Program Income does not apply to
performance-based payments.  The text does not specify the relationship of these provisions to
each other, nor does the structure of the definition clarify whether the commercial-entity carve-
out applies to performance-based payments.  Since both parties' interpretations have support in
the definition of Program Income, it is necessary to consider how each parties' proffered
interpretation is supported—or not as the case may be—by other terms of the Contracts.

Profit:  The Contracts define Profit as "[a]n amount in excess of the cost necessary to
operate a program."  J.A. 37, 1468-69.  The definition clarifies that, "Profit is allowable under a

---

[6] KRA is a "commercial organization" as defined by the Contracts to consist of "[a] private for-profit entity."  J.A.
33.

[7] The full definition of Program Income is:

> Income derived from one or more of the following sources: interest earned on any advances under this
> agreement, generated by a contractor funded by PWDC as a result of the use or fees charged for the rental
> of real or personal property, fees for services performed or conferences, the sale of commodities or items
> developed with contract funds, produced from participants' activities under the contract except during [On
> the Job Training] or revenue in excess of costs earned by organizations other than those that are
> commercial.  In performance-based contracts, program income includes the difference between the
> payments received for completing the performance benchmarks and the actual expenses incurred in
> operating the program during the program year.  Program income excludes incomes from royalties and
> license fees for copyrighted material, patent [sic], patent applications, trademarks and inventions.

J.A. 37, 236, 1468, 1654, 1796.

cost reimbursement contract," but does not specify whether profit is also allowable under a performance-based contract (or the performance-based component of a hybrid contract).[8]  J.A. 37, 1468-69.  The Contracts also limit "[t]he combination of profit and administrative cost" to 10%.  J.A. 37, 1468-69.  The parties proffer sharply differing inferences from the silence concerning performance-based contracts.  PWDC argues that this silence means that profit is not allowed under performance-based contracts.  KRA, on the other hand, argues that the specific silence concerning performance-based contracts means that a 10% limit on combined profit and administrative costs applies to cost-reimbursement payments, but that the general definition of Profit as payments "in excess of the cost necessary to operate a program" allows contractors to retain profit from performance-based payments.

Again, both parties' interpretations are reasonable.  The lack of a specific discussion of performance-based contracts in the definition of Profit could mean that profit is allowable only through cost-reimbursement payments (as PWDC's argues) or that profit is allowable under all types of payment, but limited to 10% of total costs only in the context of cost-reimbursement payments (as KRA argues).  Since each party's interpretation of Profit harmonizes with its respective interpretation of Program Income, and both parties' interpretations are reasonably supported by the Contracts, the definition of Profit does not resolve the material ambiguity concerning entitlement to performance-based payment.

---

[8] The full definition of Profit is:

> An amount in excess of the cost necessary to operate a program.  Profit is allowable under a cost reimbursement agreement to the extent that it is determined reasonable during contract negotiations.  It includes that amount which is associated with propriety materials included in the cost of the program. Profit may be allocated among the cost categories.  The combination of profit and administrative cost must not exceed 10%.

J.A. 38, 237, 1468-69, 1655, 1797.

Method of Payment: In support of its interpretation of Program Income, PWDC points to

the Method of Payment subsection governing "Performance Based Contracts," which provides

that "a performance based contract only authorizes expenses incurred during the period of the

contract and only for items budgeted for in the contract.  Contractor is responsible for

maintaining adequate books/records to document the costs incurred to execute programming

under this contract."  J.A. 42, 1473.  The section governing "Hybrid Contracts" is substantially

the same.  The only mention of profit occurs in the subsection labeled "Cost Reimbursement

Contract," which provides, *inter alia*:

> For Profit Making Agencies Only:  Contractor agrees that profit will be calculated
> on a percentage basis of actual invoice submitted.  See the Budget Summary of
> the contract, attached to the Contractors budget, for profit rate and total amount
> allowable under this agreement.

J.A. 43, 1473.  Neither the Performance Based nor the Hybrid subsections indicate that

commercial entities may retain payments that exceed actual expenses, nor do they indicate any

distinction between non-profit and for-profit entities with respect to performance-based

payments.  J.A. 42-43, 1473.[9]  In sum, the Method of Payment section lends support to PWDC's

interpretation that profit is only permitted through cost-reimbursement payments, that profit is

limited to 10% of total costs, and that performance-based payments in excess of total costs may

not be retained by contractors.  However, since these provisions do not specifically address the

---

[9] KRA argues that changes to the Method of Payment and Program Income section in the FY 2009 Contracts
demonstrate that any limits to performance-based profit were first instituted in FY 2009.  Specifically, in the FY
2009 Contracts, the Method of Payment section is not divided into separate subsections for each type of contract.
Instead, a set of general provisions are listed which apparently applies to all types of contracts, including the same
"For Profit Making Agencies" provision reproduced above, and a provision that "[f]or all methods of payment,
Contractor agrees to maintain records to document expenses equal to revenue earned.  Any revenue received in
excess of documented expense will be returned to PWDC as program income."  J.A. 219, 1637, 1779.  Additionally,
the Program Income section of the FY 2009 Contracts provides, *inter alia*, "For the purposes of this Agreement,
program income includes the difference between the payments received for completing the performance benchmarks
and the actual expenses incurred in operating the program during the program year."  J.A. 220, 1638, 1780.
However, the *definition* of Program Income, which is the only source of the commercial-entity carve-out on which
KRA's interpretation relies, was unchanged from FY 2008 to FY 2009.  J.A. 37, 236, 1468, 1654, 1796.  Thus,
KRA's argument that the meaning of Program Income changed from FY 2008 to FY 2009, based on slight changes
in other provisions in the Contracts, is unpersuasive.

for-profit carve-out from Program Income, they do not resolve the crucial ambiguity in the Contracts.

      <u>Performance Based Contract</u>: To counter PWDC's emphasis on the Method of Payment provisions, KRA points to the definition of "Performance Based Contract," which provides that "[p]ayments are based upon Contractor's performance in assisting participants reaching the defined benchmarks detailed in the Scope of Services contained in Rider A." J.A. 36, 1467. Rider A sets out detailed per-benchmark payments due under a performance-based contract, with no reference to costs. J.A. 127-29. KRA argues that if performance-based payments were contingent on actual expenses, such a requirement would be mentioned somewhere in either the definition of Performance Based Contract or in Rider A where the specific performance benchmarks are set forth. This interpretation is reasonable since it would have been logical for Rider A or the Performance Based Contract definition to clarify an expense-justification requirement if such a requirement existed. However, nothing in Rider A or the definition of Performance Based Contract supersedes or contradicts the clear requirement that KRA return Program Income, or decisively resolves the ambiguity surrounding the for-profit exclusion from Program Income. Thus, while these provisions provide reasonable support for KRA's proffered interpretation of its entitlement to performance-based payments, the sections do not unambiguously foreclose PWDC's interpretation.

      In sum, both parties have submitted interpretations reasonably supported by the written agreements and presented no extrinsic evidence to the Court that resolved those competing interpretations. Thus, the provisions in the Contracts setting forth the entitlements to performance-based payments are ambiguous as a matter of law, and the ultimate interpretation

was properly left for a jury to determine through consideration of all relevant evidence, including the language of the Contracts and any relevant extrinsic evidence concerning the parties' intent.

### 2.  The Jury's Resolution of Contractual Ambiguity

In light of the Court's finding that the Contracts are materially ambiguous, KRA would be entitled to judgment as a matter of law based on contract interpretation only if there were insufficient evidence for the jury to credit PWDC's interpretation as, in fact, the intended meaning of the Contracts.  PWDC presented extensive testimony at trial concerning its understanding of the Contracts.  PWDC Chief Financial Officer Dale Porter ("Porter"), BFO Audit Manager Daniel Higgins ("Higgins"), former PWDC CEO Ernest Jones ("Jones") (who actually signed the Contracts on behalf of PWDC), and former PWDC General Counsel Kaiyilla Smith ("Smith") all testified that the definition of Program Income applied to all payments received pursuant to hybrid contracts and that performance-based payments in excess of actual costs constitute Program Income.  J.A. 2818-20, 2829, 3013, 3017-18, 3030-32, 3034, 3041, 3043, 3089.  Porter, Higgins, and Smith also testified that the contracts allow "Profit" only as a line item expense.  J.A. 2829-30, 2976-77, 2990-92, 3026.  Smith, who was tasked with revising PWDC's Contracts in FY 2009, testified in detail about her contemporaneous understanding of both the FY 2008 and FY 2009 Contracts, and expressed an understanding of the Contracts that was consistent with the interpretation PWDC advanced at trial.  J.A. 3034-41.  This extensive body of testimony provided a sufficient basis for the jury to reasonably conclude that the ambiguous provisions in the Contracts were, in fact, intended to memorialize the reasonable interpretation put forward by PWDC at trial.

### B.  Evidence of Breach of Contract

While KRA's challenge to the Performance-Based Overpayment is based on contract interpretation, its challenge to the remainder of the Overpayments and Disallowances is premised

on its contention that PWDC failed to submit sufficient evidence for the jury to reasonably

conclude that the payment disallowances were justified.  Specifically, KRA presents a three-part

argument challenging the use of the BFO Report and PWDC Schedules and related testimony at

trial.  First, KRA argues that the BFO Report and PWDC Schedules should have been excluded

from evidence as hearsay.  Second, it argues that the documents and related testimony should

have been disallowed because they constituted undisclosed expert testimony.  Third, it argues

that even if the testimony was admissible, it provided an insufficient basis for the finding that

KRA submitted unallowable expenses.

### 1.    Admission of BFO Report and PWDC Schedules Under Rule 803(6)

The BFO Report and PWDC Schedules were admitted pursuant to Federal Rule of

Evidence 803(6), which creates an exception to the hearsay rule for records of regularly

conducted activity.  Fed. R. Evid. 803(6).  They fall within the exception because they were

created through contract-authorized audits carried out by entities that routinely audit contractors

receiving TANF funds.  *See, e.g.*, *United States v. Frazier*, 53 F.3d 1105, 1110 (10th Cir. 1995)

(holding that an audit prepared by an accounting firm that "regularly prepared audit reports," and

which had "been under contract with the DOL for ten years to perform regulatory compliance

audits" was admissible as a business record under Rule 803(6)).

The PWDC Schedules were prepared by PWDC as part of the mid- and end-year closeout

procedures in the Contracts.  The Contracts provide that "PWDC will audit the closeout reports

for compliance with TANF/EARN cost classification and allocation ability as well as State

regulations and procedure."  J.A. 45, 219, 1476, 1637, 1779.  Furthermore, the Contracts provide

PWDC with the right to review records to determine KRA's "adherence to all the performance

criteria."  J.A. 42, 219, 1472, 1637, 1779.  Porter testified at trial that the PWDC Schedules were

prepared as part of the FY 2009 year-end reconciliation review procedures, which were applied to all 12 EARN Centers under contract with PWDC in 2009, and that such audit procedures continue through the present.  J.A. 2841.

Similarly, the FY 2008 Contracts also contain provisions that allow the BETP to conduct an audit.  J.A. 68.  As explained, the BFO is an entity which is in the business of, among other things, conducting programmatic audits of contractors receiving TANF funds.  J.A. 2890-2913. The BFO audit was conducted in response to a referral from the BETP, and the BFO Report was prepared pursuant to the BFO's established procedures to memorialize such an audit.  *Id.*

KRA cites a number of cases in support of its argument that the documents should not have been admitted because they lack trustworthiness.  Each of those cases is distinguishable. Neither of the Third Circuit cases KRA cites involve an analysis of and holding under Rule 803(6).  *See Coleman v. Home Depot, Inc.*, 306 F.3d 1333, 1343 (3d Cir. 2002) ("[N]one of the aforementioned trustworthiness considerations have been invoked in this case, either here or in the District Court.  We assume therefore that the EEOC determinations were trustworthy and review the District Court's decision to exclude the EEOC Letter of Determination only under Rule 403."); *N.J. Turnpike Auth. v. PPG Indus., Inc.*, 197 F.3d 96, 109-10 (3d Cir. 1999) (noting, in the process of affirming a grant of summary judgment, that certain environmental "reports" containing conclusory findings regarding pollution were probably not the result of a government investigation and thus would not likely be admissible at trial under Rule 803(8)).  The other two opinions cited by KRA, one from this district and the other from the Ninth Circuit, involved one-off litigation-focused audits which did not have the indicia of reliability of a business record. *See Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1258 (9th Cir. 1984) (affirming a district court exclusion of audit reports produced by a trustee who had "no regular compliance audit

procedure"); *WM High Yield Fund v. O'Hanlon*, 964 F. Supp. 2d 368, 396 (E.D. Pa. 2013)

(excluding report of a trustee "prepared at the request [of] an interested party . . . largely to

determine whether there were bona fide reasons to pursue claims . . . [and] in contemplation of

litigation").

### 2.    BFO Report and PWDC Schedules as "Undisclosed" Expert Reports

KRA's argument that the BFO Report and the PWDC Schedules were improperly

admitted because they are expert reports that should have been (but were not) disclosed prior to

trial pursuant to Federal Rule of Evidence 702 also fails.  The documents contain opinions as to

whether the program or direct client costs incurred by KRA were allowable under the contract or

supported by adequate documentation.  KRA contends that these opinions bring the documents

within the scope of Rule 702.  These documents were, however, admitted into evidence under

Rule 803(6), which specifically permits admission of "a record of an . . . *opinion*" if that record

was created and kept in the regular course of business.  Fed. R. Evid. 803(6) (emphasis added).

At trial, Porter provided testimony about the PWDC Schedules, and Higgins testified

about the BFO Report.  KRA contends their testimony, like the documents, contained

undisclosed expert opinions and that, as such, it should have been excluded.

However, the Third Circuit has recognized that "when a lay witness has particularized

knowledge by virtue of [his] experience, [he] may testify—even if the subject matter is

specialized or technical—because the testimony is based upon the layperson's personal

knowledge rather than on specialized knowledge within the scope of Rule 702."  *Donlin v.*

*Philips Lighting N. Am. Corp.*, 581 F.3d 73, 81 (3d Cir. 2009).  In determining whether a witness

not designated as an expert under Rule 702 may offer lay testimony based on specialized

knowledge under Rule 701, "[a] trial judge must rigorously examine the reliability of a

layperson's opinion by ensuring that the witness possesses sufficient specialized knowledge or experience which is germane to the opinion offered."  *Id.* at 84.

KRA cites *United States v. White*, 492 F.3d 380, 401 (6th Cir. 2007), for the proposition that third-party auditor testimony concerning compliance with government program requirements is expert testimony.  However, the opinion in *White*, even if it were binding on this Court, would not mandate exclusion of Porter's and Higgins's trial testimony.  In *White*, the Sixth Circuit held that the portions of the third-party auditors' testimony that arose from "their role auditing cost reports submitted by Defendants, or from their personal interactions with Defendants" were "squarely within the proper bounds of Rule 701" and were thus properly admitted as lay testimony.  *Id.* at 403.  As the Sixth Circuit has recently clarified:

> In *White*, we held that the district court did not abuse its discretion in allowing auditors employed by Medicare fiscal intermediaries to testify about their personal involvement in auditing the defendants' cost reports and their interactions with the defendants.  However, we concluded that the district court should not have permitted the witnesses to testify, in general, about Medicare's structure and procedures without qualifying as expert witnesses because the topic of Medicare reimbursement procedures is beyond the knowledge of the average lay person.

*United States v. Kerley*, 784 F.3d 327, 340 (6th Cir. 2015) (citing *White*, 492 F.3d at 403-04).

This distinction is consistent with decisions from other circuits.  For example, the Eleventh Circuit has affirmed allowing testimony from employees of a shipbuilder concerning the reasonableness of charges under a complex ship repair contract because such testimony was "based upon their particularized knowledge garnered from years of experience within the field." *Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co., Ltd*, 320 F.3d 1213, 1223 (11th Cir. 2003); *see also United States v. Caldwell*, 586 F.3d 338, 348 (5th Cir. 2009) (affirming the admission of lay testimony by an employee of an online file sharing company concerning the operation of the company's products).

Here, KRA has failed to specify in its motion which portions of Porter's and Higgins's testimony, in its view, fall outside the scope of Rule 701.  There is not a plausible objection to the *entirety* of both witnesses' testimony because the majority of the testimony consisted of first-hand descriptions of the process that led to creation of the BFO Report and PWDC Schedules.  Furthermore, many of the conclusions reached in the documents and to which Porter and Higgins testified did not require specialized knowledge.  For example, Higgins testified that Finding No. 1 in the BFO Report was made because there was simply no support in KRA's records for $1,819,184 in expenditures invoiced for performance-based payments.  J.A. 2964-68.  This conclusion did not require the application of any specialized knowledge concerning government regulations, contract provisions, or any other field; it merely required knowledge of arithmetic and the first-hand observation of the subsidiary ledger supplied by KRA in the course of the audit.  J.A. 2967.  Similarly, Porter testified that many of the disallowances memorialized in the PWDC Schedules occurred when PWDC's audit team found "[n]o support documentation to identify as a program expense."  Trial Tr. 146:2-5, Oct. 6, 2015 (ECF No. 171).  Such findings were designated with footnotes throughout the PWDC Schedules and constitute the vast majority of disallowances asserted by PWDC for FY 2009.  J.A. 360-82.

To the extent that knowledge of TANF regulations or the payment structure of the Contracts was implicated in a portion of the testimony explaining the BFO Report and PWDC Schedules, such testimony fell within the scope of Rule 701.  Higgins's and Porter's testimony was based entirely upon their first-hand participation in the audits.  The Court strictly enforced this limitation and sustained several of KRA's objections when Higgins began to testify more generally about federal regulations or about the payment provisions in the Contracts.  J.A. 2973, 2983, 2996.  The fact that Porter and Higgins were able to coherently explain the basis for the

BFO Report and PWDC Schedules due to their experience auditing and administering government contracts does not convert their first-hand knowledge and recollection of the audit process into Rule 702 expert testimony.[10]

### 3. Insufficient Evidence to Support Disallowance

KRA's final argument concerning proof of PWDC's disallowances is that even if the BFO Reports and PWDC Schedules were admissible, they failed to set forth sufficient evidence in support of PWDC's disallowance of KRA's invoiced expenses, including the disallowance of indirect expenses incurred in FY 2009. This argument questions the credibility of several days' worth of testimony concerning the methodology and findings of the BFO Report, PWDC Schedules, and KRA's responses to requests for documentation. Specifically, Porter and Higgins both testified that they and their respective staffs reviewed KRA's invoices, records, and books to reach the conclusion that certain expenses were not allowable. J.A. 2840-42, 2846-52, 2853-61, 2890-2913. Evaluating the credibility of this testimony is a role for the jury. If credited, this testimony, alongside the BFO Report and PWDC Schedules, provides ample evidence upon which the jury could reasonably conclude that the expenses were properly disallowed and that KRA was thus liable to repay PWDC for such expenses.

---

[10] In addition to the failure to specify which testimony fell outside the scope of Rule 701, and the lack of authority supporting the argument that Porter and Higgins offered any expert testimony, KRA's contention that it was prejudiced by the "undisclosed" use of the BFO Report, the PWDC Schedules, and the testimony about those documents is undermined by the fact that the reports and excerpts of relevant deposition testimony were attached to PWDC's cross-motion for summary judgment in April 2014. *See* PWDC Cross-Mot. for Summ. J. Exs. D, E, F, H, & Y. Thus, the contents of the BFO Report, the PWDC Schedules, and the likelihood that Porter and Higgins would testify at any trial were revealed in a motion filed by PWDC more than 18 months before trial. Almost a year before trial, the Court overruled KRA's objections to PWDC's use of the documents at the summary judgment stage, which reiterated the possibility that the documents could be admitted at trial. Furthermore, KRA was provided with a copy of the BFO Report in late 2009, and served its first extensive response to that report in a letter from KRA's trial counsel to Higgins dated November 20, 2009—nearly six years prior to trial. J.A. 343-50. In short, KRA had far more notice of the contents of the BFO Report, PWDC Schedules, and related testimony than would have been required if Porter and Higgins had testified as experts and offered expert opinions beyond their personal knowledge of the case. *See* Fed. R. Civ. P. 26(a)(2)(D)(i) (requiring disclosure of the subject matter of expert testimony 90 days before trial).

C.     **Timeliness of Contract Claims**

KRA's third set of arguments in support of its motion for judgment as a matter of law

center around its contention that PWDC neither pled nor disclosed "many of the breach claims

advanced at trial."   This argument frames each aspect of PWDC's breach of contract argument

and its defense of KRA's counterclaim as a new "claim." This attempt to frame each of PWDC's

arguments as "new claims" distorts the straightforward and consistent legal claim which PWDC

propounded during the pre-trial process and presented to the jury at trial.

The breach of contract upon which the jury assigned liability to KRA arose from KRA's

failure to return payments for FY 2008 expenses, with a deduction for the stipulated allowable

payments due to KRA for FY 2009 and FY 2010.  In its Amended Complaint, PWDC asserted

an affirmative claim for breach of contract.  Am. Compl. ¶ 36-38.  In the allegations incorporated

with this claim, PWDC pled that the Contracts required KRA to justify payment under "all

methods of payment," that "the manner in which KRA earned any profit was detailed in the

Contracts and Agreements," that "KRA received more profit than KRA was entitled to receive,"

and that "each Contract and Agreement was subject to audits."  *Id.* ¶¶ 11, 18, 19, 23.  At trial,

PWDC advanced precisely the same claim for recovery asserted in its cross-motion for summary

judgment, filed 18 months before trial:  that it was entitled to recover $2,219,060 of

"Overpayment" to KRA from 2008, which should be set off by later allowable, but yet-unpaid

expenses submitted by KRA in the amount of $59,190 (for FY 2009) and $1,998,719 (for FY

2010).  PWDC Cross-Mot. for Sum. J. at 41; PWDC Pretrial Memorandum at 4 (ECF No. 129).

In other words, PWDC proceeded at trial on the same breach of contract claim contained in the

Amended Complaint, elaborated through evidence obtained in discovery, and argued at summary

judgment.  PWDC was not, as KRA contends, introducing new, specific breach claims

throughout the trial.  It was, as every party does in every trial, simply using the evidence

obtained through discovery to put meat on the bones of the claims asserted in its Amended

Complaint:  that KRA was paid more than allowed under the Contracts and failed to return such

overpayment.

In sum, because the payment provisions of the Contracts were ambiguous as a matter of

law and properly submitted to a jury for resolution, and the record contains sufficient admissible

evidence from which the jury could reasonably adopt PWDC's interpretation of the Contracts,

and find KRA liable and PWDC not liable for breach, KRA's post-trial motion for judgment as a

matter of law shall be denied.

## V.      MOTION FOR A NEW TRIAL

"[E]ven when judgment as a matter of law is inappropriate," a new trial may be granted

pursuant to Federal Rule of Civil Procedure 59.  *Wagner v. Fair Acres Geriatric Ctr.*, 49 F.3d

1002, 1017 (3d Cir. 1995).   Rule 59(a)(1)(A) provides a court with the discretion to grant a new

trial after a jury verdict "for any reason for which a new trial has heretofore been granted in an

action at law in federal court."  A district court generally has wide discretion in the application of

Rule 59, but when the proffered basis for a new trial is that "the verdict is contrary to the great

weight of the evidence," the court's discretion is narrowed to cases "where a miscarriage of

justice would result if the verdict were to stand."  *Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 453 (3d

Cir. 2001) (internal quotation marks omitted).  Put another way, "new trials because the verdict

is against the weight of the evidence are proper only when the record shows that the jury's

verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be

overturned or shocks our conscience."  *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1353

(3d Cir. 1991).  This limit "seeks to ensure that a district court does not substitute its judgment of

the facts and the credibility of the witnesses for that of the jury." *Fineman v. Armstrong World Indus. Inc.*, 980 F.2d 171, 211 (3d Cir. 1992) (internal quotation marks omitted).

KRA argues that a new trial should be granted due to errors on matters of evidence, jury instructions, and the denial of a motion to reconsider the trial scheduling order.

## A.    Admission of BFO Report, PWDC Schedules, and other "Prejudicial" Evidence

KRA makes two evidentiary arguments in support of its Rule 59 motion.  First, it argues that the BFO Report and PWDC Schedules should not have been admitted.  Second, it argues that the Court erroneously admitted other "highly prejudicial and irrelevant" evidence.  The admissibility of the BFO Report and PWDC Schedules is discussed at length above in relation to KRA's Rule 50 motion.  In short, both documents were generated in the regular course of business and are thus admissible under Federal Rule of Evidence 803(6), and KRA did not demonstrate sufficient levels of untrustworthiness to warrant their exclusion.

With respect to the other "prejudicial and irrelevant" evidence, KRA cites what it describes as PWDC's "inflammatory rhetoric" concerning KRA's withdrawal from management of the EARN Centers, and the admission into evidence of a document referred to at trial as the Subcontractor Expense Summary ("SES").  With respect to KRA's withdrawal from the EARN Centers, KRA does not allege that any specific evidence was improperly admitted.  Rather, KRA cites to PWDC's closing argument in an objection to counsel's rhetoric about abandonment of clients.  *See* J.A. 1447.  Improper remarks by counsel are only grounds for a new trial if "the improper assertions have made it reasonably probable that the verdict was influenced by prejudicial statements."  *Fineman*, 980 F.2d at 207 (internal quotation marks omitted).  Here, KRA has failed to demonstrate improper prejudice created by PWDC's rhetoric concerning KRA's exit from the EARN Centers.  In PWDC's opening statement, as part of the chronology

of relevant events, counsel noted that KRA "suddenly . . . left the two EARN Centers it was

operating.  The defendant abandoned the locations, took the files which were necessary for these

clients to get their benefits.  PWDC scrambled to place all these clients, recover their files and

prevent these people from being harmed."  Trial Tr. 100:22-101:3, Oct. 1, 2015 (ECF No. 168).

Counsel for KRA responded to this narrative by describing KRA as a "very ethical company"

that was "committed to its clients" because it decided to provide services after PWDC

discontinued payment in 2009.  Trial Tr. 104-07, Oct. 1, 2015.  KRA also offered testimony by

its President and CEO Knowlton Atterbeary concerning KRA's 35-year history of serving

"individuals that are unemployed by no circumstance of their own" as well as its work in the area

of "youth employment, particularly disadvantaged youth."  Trial Tr. 63, Oct. 7, 2015 (ECF No.

172).  Thus, both PWDC and KRA offered, as a small part of their overall presentations of the

case to the jury, a narrative concerning KRA's departure from the EARN Centers, and KRA

offered additional testimony concerning its history of serving unemployed individuals.  The

record does not support KRA's argument that PWDC's rhetoric concerning KRA's departure

from Philadelphia was unduly inflammatory, or even that it was more prejudicial than KRA's

own statements on the same topic.  Furthermore, KRA has not put forward evidence to suggest

that the jury rendered its verdict based upon the brief rhetorical flourishes concerning KRA's

departure, rather than upon careful consideration of the eight days of testimony and the parties'

systematic articulation of their competing interpretation of the Contracts.

    KRA's argument that the SES is irrelevant is circular.  KRA argues that because it did

not realize that profit was limited, the SES it submitted to PWDC could not evince an effort to

hide profit or a realization that PWDC believed the Contracts limited profit.  But this argument

assumes the truth of the very testimony that the SES was offered to contradict.  The SES is

relevant precisely *because* it tends to contradict KRA's claim that it was unaware of limitations on profit—the crucial issue of dispute in this case.

### B.    PWDC's "Undisclosed Claims"

KRA argues that it was prejudiced by "undisclosed claims" raised at trial in an "ambush" strategy in contravention of federal discovery and disclosure rules.  But, as noted above in the context of KRA's Rule 50 motion, PWDC presented fundamentally the same argument at trial that it presented in its summary judgment motion:  KRA breached the contract by refusing to return payments upon a deficient audit finding.  Indeed, the numbers entered by the jury in the Matrix on the Jury Verdict Form ($2,219,060 owed by KRA for FY 2008, $59,190 owed by PWDC for FY 2009, and $1,998,719 owed by PWDC for FY 2010) are exactly the same amounts set forth in the Conclusion to PWDC's cross-motion for summary judgment filed on April 3, 2014.  This motion set forth PWDC's fundamental claim in forty pages of detailed argument.  If KRA was not prepared to respond to these same cost disallowance arguments 18 months later at trial, after nearly six years of litigation focused on KRA's payment obligations, it was not because it was ambushed by "undisclosed" claims.

### C.    Exclusion of KRA Schedule Regarding Supportive Services

KRA argues that a set of spreadsheets prepared under the direction of KRA Chief Operating Officer Patrick Boxall enumerating expenditures for support services (the "KRA Schedule") was improperly excluded as hearsay.  *See* J.A. 726-1318.  In arguing that the KRA Schedule should have been admitted as a business record pursuant to Federal Rule of Evidence 803(6), KRA equates the procedures KRA used in producing the document with the procedures that gave rise to the BFO Report and PWDC Schedules.  This analogy is not warranted.  The BFO Report was produced pursuant to state regulations and contractual provisions by a state

agency in the business of auditing the performance of government contractors.  The PWDC

Schedules memorialized the exercise of PWDC's contractual right to audit contractors'

performance, and resulted from one of numerous such audits of all EARN Center operators in

FY 2009.  The KRA Schedule, on the other hand, was a unique document produced by KRA

after it had been sued concerning the performance of its Contracts with PWDC.  J.A. 3113-19.

Thus, not only does the KRA Schedule fail to meet the requirements of Rule 803(6) for

admission as a record of regularly recorded business because it constitutes a unique report, it also

has strong indicia of untrustworthiness, as it was prepared for the specific purpose of responding

to PWDC's legal claims.  Since the KRA Schedule constitutes an out-of-court statement being

offered for the truth asserted therein (*i.e.*, the expense justifications), and it does not qualify for

an exception to hearsay, it was excluded.

### D.      Exclusion of Ernest Jones's E-mail

KRA next argues that an e-mail from Ernest Jones, former CEO of PWDC, to Linda

Blanchette, Deputy Secretary for Income Maintenance for the Commonwealth of Pennsylvania,

was improperly excluded on relevance grounds.  The e-mail proposes the establishment of

"caps" on the amount each EARN Center could receive for performance benchmarks in FY

2010.  J.A. 723.  KRA contends that this is relevant parol evidence of PWDC's understanding of

the performance-based payment structure in the Contracts.  However, the e-mail does not address

this issue.  The message from Jones concerns a separate topic: whether the FY 2010 budgets

should limit the overall number of benchmarks available for each EARN Center to earn through

performance-based payments.  The e-mail sheds no light on PWDC's understanding of the

relationship between performance-based payment and actual expenses for for-profit contractors.

Since Jones's desire to impose a cap on the number of benchmarks a contractor could earn in FY

2010 is not probative of PWDC's understanding of whether the Contracts required that performance-based payments be supported by actual expenses, the e-mail was not relevant for resolving the dispute presented to the jury.

### E.    Rejection of Jury Instructions on Contract Interpretation Principles

At the conclusion of the trial, KRA proposed jury instructions that contained a detailed exposition of Pennsylvania contract law, including numerous instructions that explicitly concerned the determination of contractual ambiguity as a matter of law.  These proposed instructions conflated the role of the Court and the jury in a contract dispute.  In Pennsylvania, "[i]t has long been accepted in contract law that an ambiguous written instrument presents a question of fact for resolution by the finder-of-fact, whereas the meaning of an unambiguous written instrument presents a 'question of law' for resolution by the court."  *Cmty. College of Beaver Cnty. v. Cmty. College of Beaver Cnty., Soc'y of the Faculty*, 375 A.2d 1267, 1275 (Pa. 1977); *see Hewes v. McWilliams*, 194 A.2d 339, 342 (Pa. 1963) (noting that it would be error to submit a "clear and unambiguous" contract to interpretation by a jury).  While the Court must carefully apply the established rules of contract construction in its analysis of contractual ambiguity, '[i]f the contract is determined to be ambiguous, then the interpretation of the contract is left to the factfinder, to resolve the ambiguity in light of extrinsic evidence."  *Hullett v. Towers, Perrin, Forster & Crosby, Inc.*, 38 F.3d 107, 111 (3d Cir. 1994) (applying Pennsylvania law); *Synthes, Inc. v. Emerge Med., Inc.*, 25 F. Supp. 3d 617, 679-80 (E.D. Pa. 2014) (same).

Consistent with this clear division of responsibility, the Court instructed the jury to "determine the meaning of the contracts as shown by the language of the contracts along with the parol evidence of the intent of the parties."   J.A. 3172.  This instruction did not, as KRA argues, leave the door open for the jury to "adopt an interpretation based on parol evidence finding no

support in the language or inconsistent with the fundamental rules of contract interpretation."
KRA Br. at 34.  Furthermore, the Court had already decided as a matter of law that both
PWDC's and KRA's interpretations of the material aspects of the Contracts are supported by the
language of the agreements in light of the rules of contract interpretation.  Including KRA's
requested instructions on the comprehensive legal framework governing contract ambiguity
would have yielded instructions that were both legally inappropriate and potentially confusing.
There is no basis for instructing the jury on an issue that was decided by the Court prior to trial
and which is not within the purview of a jury's fact-finding role under Pennsylvania law.  Doing
so would have served only to complicate the jury's clear mandate to resolve a contractual
ambiguity through an examination all relevant and admissible evidence concerning the parties'
intent as memorialized in the Contracts.

**F.      Denial of Motion to Reconsider Trial Scheduling Order**

As a final ground for a new trial, KRA argues that the Court should not have denied its
motion for reconsideration of the April 2, 2015 Scheduling Order.  Reconsideration of the
Scheduling Order was inappropriate for the reasons set forth in the Court's Memorandum
Opinion of April 24, 2015.  *See Phila. Workforce Dev. Corp. v. KRA Corp.*, No. 09-cv-5261,
2015 WL 1893224 (E.D. Pa. Apr. 24, 2015).  To the extent that KRA now argues that denial of
reconsideration unfairly penalized KRA's decision to wait until the fifth year of litigation to
seriously pursue expert testimony because it sought to exhaust all possible settlement options, the
Court notes that the Federal Rules of Civil Procedure contain no provision that permits parties to
delay litigating a case until after all settlement options have proven fruitless.  Quite the opposite,
Rule 26 disclosure requirements promote expert discovery well in advance of trial to allow

parties a chance to explore settlement with a full picture of the issues and evidence.  *See* Fed. R. Civ. P. 26(a) advisory committee's note (1993).

Because KRA has not shown that the jury's verdict was contrary to the great weight of the evidence, nor demonstrated error arising from the Court's evidentiary and procedural rulings, its motion for a new trial shall be denied.

## VI.    CONCLUSION

KRA has failed to demonstrate that the jury lacked sufficient evidence to render its verdict or that the Court's rulings on evidence, issues at trial, or discovery deadlines were made in error.  Accordingly, its motion for judgment at a matter of law or, in the alternative, a new trial shall be denied in all respects.

Dated:  January 14, 2016

**BY THE COURT:**

**/S/WENDY BEETLESTONE, J.**

_____

**WENDY BEETLESTONE, J.**